UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

United States of America,

    Plaintiff,

 vs.       REPORT AND RECOMMENDATION

Joseph Joshua Jackson,

     Defendant.   Crim. No. 10-151 (DWF/RLE)

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*


## I.  Introduction

This matter came before the undersigned United States Magistrate Judge pursuant to a general assignment, made in accordance with the provisions of Title 28 U.S.C. §636(b)(1)(B), upon the Defendant's Motion to Dismiss the Indictment, for lack of Federal Jurisdiction.  See, Docket No. 22.

A Hearing on the Motion was conducted on July 6, 2010, at which time, the Defendant appeared personally, and by Andrea K. George, Assistant Federal Defender, and the Government appeared by Clifford B. Wardlaw, Assistant United States Attorney.  Upon receipt of the parties' supplemental Memoranda, we took the

Motion under advisement on July 30, 2010.[1]  For reasons which follow, we recommend that the Motion be denied.

## II. Factual and Procedural Background.

In his Indictment, the Defendant, who is an Indian, is charged with one (1) Count of Assault with Intent to Commit Murder, two (2) Counts of Assault with a Dangerous Weapon, and one (1) Count of Discharging a Firearm During the Commission of a Crime of Violence, in violation of Title 18 U.S.C. §§113(a)(1), and (a)(3), 924(c), 1151, and 1153(a).  See, Indictment, Docket No. 8.  The events which gave rise to those charges are alleged to have occurred on or about April 29, 2010. Id.  As alleged in the Indictment, the Defendant assaulted Danielle Adele King, who is also an Indian, with the intent to commit murder, and with dangerous weapons -- namely, a pistol and shod feet -- with the intent to do bodily harm, and also discharged a firearm during the commission of the alleged assaults.  Id.  Those events are alleged

---

[1]As noted, at the close of the Hearing, the parties requested leave to submit post-Hearing briefing.  Leave was granted, as were extensions of the deadlines for both parties, and the Defendant submitted a brief on July 26, 2010, and the Government filed its response on July 30, 2010, and accordingly, the Motions were taken under advisement on that latter date.  See, Title 18 U.S.C. §3161(h)(1)(D) and (H); Henderson v. United States, 476 U.S. 321, 330-32 (1986)(discussing the provision prior to the 2008 restructuring of the statute's subparts); United States v. Blankenship, 67 F.3d 673, 676-677 (8th Cir. 1995)(same).

to have taken place in the State and District of Minnesota, and within the exterior boundaries of the Red Lake Indian Reservation.  Id.

At the Hearing, counsel for the Defendant represented that the alleged crimes occurred in the town of Redby, Minnesota, in Block 29, which is where the Redby Garage is assertedly located, although the Complaint alleges that the alleged crimes took place near the Post Office, which counsel for the Defendant represented to be located in Block 30.  See, Docket No. 1.  The Defendant introduced into evidence, without objection from the Government, a plat of Redby, including those specific Blocks.  See, Defense Exhibit 1.  The Defendant also introduced Exhibits, without objection from the Government, which demonstrate that, within Block 29, Lots 7-12, are privately owned property, which are currently owned by the Redby Garage, Inc., and for which property taxes are assessed by Beltrami County in the State of Minnesota.  See, Defense Exhibits 2-7.

In addition, the plat reflects that there is a railroad track, which is operated by the Minneapolis, Red Lake, and Manitoba Railway (the "Railway"), which runs through Redby, and along Block 29.  See, Defense Exhibit 1.  There is no dispute that the railway line and its appurtenant land, including Block 29 (collectively, the "Land"), which is currently privately owned, was transferred from the Red Lake Band,

to private ownership, and has been transferred through subsequent private ownership, see, Defense Exhibits 2-7; Government's Response, Docket No. 33, at pp. 3-4 of 5, Defendant's Memorandum, Docket No. 32, at pp. 7-8 of 10, and that the Land is located entirely within the exterior boundaries of the Red Lake Reservation.

In support of his Motion, the Defendant argues that, when the Land was transferred from the Red Lake Band to the Railway, by authorization of Congress in an Act of February 8, 1905, 33 Stat. 708 (the "Act of 1905"), Congress intended to diminish the Reservation by that Land, so that it was no longer a part of the Red Lake Reservation. See, Defendant's Memorandum, Docket No. 32, at pp. 4-7 of 10. As a consequence, the Defendant argues that the Land is no longer a part of Indian Country, so that there is no Federal jurisdiction over the alleged crimes, and the Indictment must be dismissed for want of subject matter jurisdiction.

The Government disputes that the alleged crimes occurred on the Block where Redby Garage is located, and contends that the correct location is an alley between the Redby Garage, and the Redby Post Office, but does not clarify whether this location is on the Land, although it appears to be. In addition, the Government argues that private ownership of the Land does not eliminate Federal jurisdiction over crimes that occur within the exterior boundaries of the Red Lake Reservation, absent an Act of

Congress that clearly diminishes the Reservation, even when a transfer to private ownership has been authorized by an Act of Congress. See, <u>Government's Response, Docket No. 33</u>. With the foregoing as a backdrop, we proceed to the merits of the Motion.

### III. <u>Discussion</u>

A. <u>Standard of Review</u>. Title 18 U.S.C. §1153(a) provides that an Indian who commits one (1) or more of a number of offenses, including Assault with Intent to Murder, and Assault with a Dangerous Weapon, against another Indian, and "within the Indian country," is subject to the exclusive jurisdiction of the United States. See also, <u>United States ex rel. Condon v. Erickson</u>, 478 F.2d 684, 685 (8th Cir. 1973). For purposes of Section 1153(a), the Statutes define "Indian Country" as "all land within the limits of any Indian reservation under the jurisdiction of the United States Government, notwithstanding the issuance of any patent, and, including rights-of-way running through the reservation * * *." <u>Title 18 U.S.C. §1151</u>; see also, <u>Title 18 U.S.C. §1162(a)</u>(excluding the Red Lake Reservation from the extension of Minnesota State criminal jurisdiction into Indian Country).

Accordingly, with respect to Federal jurisdiction over criminal conduct in Indian Country, private ownership is largely irrelevant, as a non-Indian-owned parcel

of land, that is located within the exterior boundaries of a Reservation, is subject to Federal jurisdiction as part of Indian Country, unless the boundaries of the Reservation were clearly and plainly diminished[2] by Congress, in authorizing the transfer of the property to private ownership.  See, <u>South Dakota v. Yankton Sioux Tribe</u>, 522 U.S. 329, 343 (1998); <u>Seymour v. Superintendent of Washington State Penitentiary</u>, 368 U.S. 351, 355-56 (1962).[3]

As is clear, only Congress has the authority to diminish a Reservation, and "[o]ur touchstone to determine whether a given statute diminished or retained reservation boundaries is congressional purpose."  <u>Id.</u>, citing <u>Rosebud Sioux Tribe v. Kneip</u>, 430 U.S. 584, 615 (1977).  Complicating this inquiry is the fact that, at the turn of the Twentieth Century, Congress had undertaken to divide devoted Reservation lands into private ownership, in order to promote assimilation of Indian persons into

---

[2]"[D]iminishment commonly refers to the reduction in size of a reservation." <u>Yankton Sioux Tribe v. Gaffey</u>, 188 F.3d 1010, 1017 (8th Cir. 1999), cert. denied, 530 U.S. 1261 (2000).

[3]The Supreme Court explained, in <u>Solem v. Bartlett</u>, 465 U.S. 463, 470 (1984), as follows:

> Once a block of land is set aside for an Indian Reservation and no matter what happens to the title of individual plots within the area, the entire block retains its reservation status until Congress explicitly indicates otherwise.

white agrarian culture, and expected that Reservations would soon cease to exist altogether, and so, Congress "'failed to be meticulous in clarifying whether a particular piece of legislation formally sliced a certain parcel of land off one reservation.'" Id., quoting Solem v. Bartlett, 465 U.S. 463, 468 (1984). As a consequence, while our primary consideration is the language of the relevant Act of Congress, we must also "consider the historical context surrounding the passage" of the Act, "and, to a lesser extent, the subsequent treatment of the area in question and the pattern of settlement there." Id. at 344 [internal quotations omitted].

Further, "we will not lightly find diminishment," id. at 344 [internal quotations omitted], and "[w]hen both an act and its legislative history fail to provide substantial and compelling evidence of a congressional intention to diminish Indian lands, we are bound by our traditional solicitude for the Indian tribes to rule that diminishment did not take place and that the old reservation boundaries survived the opening." Solem v. Bartlett, supra at 472; Hagen v. Utah, 510 U.S. 399, 411 (1994)("[T]he statutory language must establish an express congressional purpose to diminish," although it need not consist of particular phrases.)[internal quotations and alterations omitted]; see also, Yankton Sioux Tribe v. Gaffey, 188 F.3d 1010, 1021 (8th Cir. 1999) (congressional intent to diminish "must be 'expressed on the face of the Act or be

clear from the surrounding circumstances and legislative history.'"), quoting <u>Mattz v. Arnett</u>, 412 U.S. 481, 505 (1973); <u>United States ex rel. Condon v. Erickson</u>, supra at 688, 689 ("A reservation * * * may be diminished in land size by sale of portions thereof to non-Indians without changing the reservation's boundaries," and "a holding favoring federal jurisdiction is required unless Congress has **expressly or by clear implication** diminished the boundaries of the reservation opened to settlement.") [emphasis in original].

B.     <u>Legal Analysis</u>.  As a threshold matter, we have no basis, in the Record provided, to find that the offenses, which are alleged against the Defendant, occurred where the Defendant claims, or where the Government alleges.  As a result, we make no findings on that issue and, in fact, we are without authority, under the governing Rules, to do so even if the Record were sufficient.  See, <u>Rule 12(b)(2), Federal Rules of Criminal Procedure</u> ("A party may raise by pretrial motion any defense, objection, or request that the court can determine **without a trial of the general issue**.") [emphasis added].  Accordingly, for these purposes, we assume, without deciding, that the charged offenses occurred where the Defendant maintains that they took place.  Even on that assumption, however, we find that we would have subject matter to adjudicate the offenses charged in the Defendant's Indictment.

In pertinent part, the Act of 1905 provides as follows:

> [T]here is hereby granted to the Minneapolis, Red Lake and Manitoba Railway Company * * * owning and operating * * * a line of railroad in the State of Minnesota, having its northern terminus at a point on the shore of Lower Red Lake, Minnesota * * * in the Red Lake Indian Reservation,* * * pursuant to the provisions of the Act of Congress approved March second, eighteen hundred and ninety-nine, entitled "An Act to provide for the acquiring of rights of way by railroad companies through Indian reservations, Indian lands, and Indian allotments, and for other purposes" [30 Stat. 990], the right to select and take from the lands of the Red Lake Indian Reservation grounds adjacent to its northern terminus * * * not to exceed in extent three hundred and twenty acres.

>              *      *      *

> Sec. 2.     That before title to said lands shall vest in the said railway company, and before said company shall occupy or use said lands, compensation therefor shall be made to the tribes of Indians residing upon the said reservation and to any individual occupant of any of said lands. The amount of compensation for said lands shall be ascertained and determined in such manner as the Secretary of the Interior may direct and be subject to his final approval.

>              *      *      *

> Sec. 5.     The laws of the United States now in force, or that may hereafter be enacted, prohibiting the introduction and sale of intoxicating liquors in the Indian country, shall be in full force and effect throughout the territory hereby

> granted, until otherwise directed by Congress or the President of the United States, and for that purpose said tract shall be held to be and to remain a part of the diminished Red Lake Indian Reservation.

This language stands in marked contrast to an Act passed by Congress only the year before, on February 20, 1904, 33 Stat. 46 (the "Act of 1904"), which provided as follows:

> Article I.  The said Indians belonging on the Red Lake Indian Reservation, Minnesota, for the consideration hereinafter named, do **hereby cede, surrender, grant, and convey to the United States all their claim, right, title and interest** in and to all that part of the Red Lake Indian Reservation lying west of the range line between ranges thirty-eight and thirty-nine, west of the fifth principal meridian * * * and also hereby agree that all of said Indians now residing on the tract **hereby ceded** shall remove to the diminished reservation within six months after the ratification of this agreement, and shall be paid not exceeding twenty thousand dollars in cash by the Indians of said Red Lake Reservation * * * to be paid equitably to those thus removing, in proportion to the value of their respective improvements, which payment by said Red Lake Indians shall be in full for all improvements which they will abandon, and also for the removal within the diminished reservation of their dead from where they are now buried on the tract hereby ceded.

Id. [emphasis added].

The Act of 1904 goes on to provide for the sale of the ceded land, in individual parcels, by the United States, the proceeds of which were to be paid to "each man,

woman, and child belonging on said Red Lake Indian Reservation," to "share, and share alike," beginning with a $300,000.00 payment, with subsequent payments over the next fifteen (15) years.  Id.

In <u>Solem v. Bartlett</u>, supra at 472-73, the Supreme Court held that the language in a 1908 Act of Congress, which provided that the Secretary of Interior was "authorized and directed" "to sell and dispose of [a certain] portion of the Cheyenne River and Standing Rock Indian reservation," [footnote omitted], failed to demonstrate a clear congressional intent to diminish the Reservation, particularly when contrasted with the language of other Acts, that had clearly intended to diminish or eliminate Reservations, and which recited, much like the Act of 1904 above, the existence of "an Indian agreement to 'cede, sell, relinquish and convey' the opened lands."  <u>Id.</u> at 473, citing <u>DeCoteau v. District County Court</u>, 420 U.S. 425, 445 (1975), and <u>Rosebud Sioux Tribe v. Kneip</u>, supra at 597;[4] see also, <u>Hagen v. Utah</u>,

---

[4]In <u>Rosebud Sioux Tribe v. Kneip</u>, 430 U.S. 584, 588 n. 4, 605-14 (1977), the Supreme Court found that two (2) Acts, which did not contain explicit "cession language," evinced an intent to diminish the Rosebud Sioux Reservation, because of the history of the enactment of those Acts, and their relation to an earlier Act, which had contained explicit cession language, where none of the parties disputed that the intent of all of the Acts was identical.

supra at 412 (the relevant Act provided that, after allotments to the Reservation members had been made, the surplus land "shall be restored to the public domain.").

In the earlier decision of <u>Seymour v. Superintendent of Washington State Penitentiary</u>, supra at 354-56, the Supreme Court held that the language of an Act of Congress of 1906, which provided for the sale of mineral lands, and for the settlement and the entry by non-Indian settlers, in what was known as the "South Half" of a Reservation in Washington State, did not evince an intention to diminish, and again, contrasted that language with a previous Act, which had provided that the "North Half" "should be 'vacated and restored to the public domain.'"  Given the contrast in the language employed by Congress, the Court found that the language in the Act, which concerned the South Half, "did no more than open the way for non-Indian settlers to own land on the reservation in a manner which the Federal Government, acting as guardian and trustee for the Indians, regarded as beneficial to the development of its wards."  <u>Id.</u> at 356.  Similarly, in <u>Mattz v. Arnett</u>, supra at 495-97, the Supreme Court found that the Klamath River Reservation, which had been opened, by an Act of Congress, to the "settlement, entry, and purchase" by non-Indians, had not had its boundaries terminated by that Act.

Our Court of Appeals has also addressed the issue concerning the diminishment of Reservation land.  In Yankton Sioux Tribe v. Gaffey, supra, which was heard on appeal after the case had been remanded by the Supreme Court, in South Dakota v. Yankton Sioux Tribe, supra, and also remanded by the Eighth Circuit, 141 F. 3d 798 (8th Cir. 1998), the Court of Appeals held that, under the language of the relevant Act, and the historical context, Congress had intended that the Reservation would be diminished by the land which had been allotted to individual Indians, and which then passed to non-Indian owners.[5]

As is clear from those cases, when Congress has merely authorized the purchase of lands that are located within the exterior boundaries of a Reservation, albeit by non-Indian entities, without something more that clearly demonstrates a contrary intent, the boundaries of the Reservation remain unchanged.  Here, the Defendant relies upon

---

[5]The Defendant urges us to conclude that Yankton Sioux Tribe v. Gaffey, 188 F.3d 1010 (8th Cir. 1999), is controlling in this case, but we find that case to be wholly distinguishable.  The language of the Act, as well as the circumstances that surrounded the allotments -- including language that reflected the parties' understanding, that once the allotments passed out of trust status with the Federal Government, and could be sold to non-Indians, the allottees would be subject to State criminal and civil jurisdiction -- was amply sufficient to persuade the Court that Congress had  clearly demonstrated an intent to gradually permit the State to exercise greater control over the area.   Those circumstances are markedly distinct from the language and circumstances that confront us here, where the Land was never a part of an allotment, as the Defendant recognizes in his Memorandum.  See, Docket No. 32, at p. 2 of 10.

language in the Act of 1905, that the Railway was permitted to "take from the lands of the Red Lake Indian Reservation," as demonstrating a clear intent to diminish the Reservation, but we find no merit in that argument. The language "take from the lands" is a far cry from "cede, surrender, relinquish and convey," or "return to the public domain," which the Supreme Court has found to demonstrate a clear intention to diminish and, as we have noted, is significantly different than the unequivocal language that was included in the Act of 1904 -- which also concerned the Red Lake Reservation -- that there was an agreement to "cede, surrender, grant, and convey to the United States all [the Indians'] claim, right, title and interest in" the ceded section of the Reservation. Moreover, reading the Act as a whole, the most reasonable interpretation is that the phrase "take from the land" merely relates to the title that would vest in the Railway, once the Railway completed the specified predicates and, again, as we have explained, the question of title is not determinative of the question of jurisdiction.

Notwithstanding the Defendant's argument, that the Act of 1905 is materially different from the Act at issue in <u>Seymour v. Superintendent of Washington State Penitentiary</u>, we find the language, that Congress employed in the Act of 1905, which simply provided that the Land could be sold to the Railway, is virtually identical, in

all material particulars, to the language in <u>Mattz v. Arnett</u>, <u>Seymour v. Superintendent of Washington State Penitentiary</u>, and <u>Solem v. Bartlett</u>, which also simply provided that parcels of land, within the respective Reservations, could be sold to non-Indians, which stands in sharp contrast to the clear and plain language cited in the Act of 1904, and in <u>DeCoteau v. District County Court</u>, <u>Hagen v. Utah</u>, and <u>South Dakota v. Yankton Sioux Tribe</u>. As a consequence, we conclude that Congress' use of the term "take from the lands" in the Act of 1905 does not even suggest, let alone "present an explicit expression of," congressional intent to diminish the Red Lake Reservation. See, <u>Solem v. Bartlett</u>, supra at 476.

The Defendant also relies upon the language in Section 5 of the Act of 1905, which provides that "[t]he laws of the United States * * * prohibiting the introduction and sale of intoxicating liquors in the Indian country, shall be in full force and effect throughout the territory hereby granted * * * and for that purpose said tract shall be held to be and to remain a part of the diminished Red Lake Indian Reservation." As urged by the Defendant, that language would be unnecessary if the land remained a part of the Reservation, and of Indian Country, because the laws in effect at that time already prohibited the sale of intoxicating liquors in Indian Country. Under the

circumstances which control our analysis, we find the Defendant's argument to be unpersuasive.

We accept that the Supreme Court, in <u>South Dakota v. Yankton Sioux Tribe</u>, supra at 350-51, found that a similar, post-transfer alcohol prohibition, supported its conclusion that the cession of certain lands had diminished the Reservation, but it is clear, in that case, that the "cession," and the "sum certain" language of the relevant Act, were significantly more important to the Court's holding and, similarly, in <u>Rosebud Sioux Tribe v. Kreip</u>, supra at 605-14 and n. 47, the Court relied primarily upon the circumstances surrounding the series of Acts, as well as the explicit cession language, in the first of the three (3) Acts. As a consequence, we do not find those cases to support the Defendant's argument, that where, as here, there is no such clear language or circumstances, the inference that can be drawn from an alcohol prohibition, standing alone, "clearly and plainly" demonstrates a congressional intent to diminish.

Indeed, in another decision, where there was no clear language in the relevant Act, that demonstrated an intent to diminish, the Supreme Court explained that "[t]he notion that reservation status of Indian lands might not be coextensive with tribal ownership was unfamiliar at the turn of the [Twentieth] century," because "Indian

lands were judicially defined to include only those lands in which the Indians held some form of property interest: trust lands, individual allotments, and, to a more limited degree, opened lands that had not yet been claimed by non-Indians."[6] Solem v. Bartlett, supra at 468; see also, Bates v. Clark, 95 U.S. 204, 208 (1877). In light of that history, the Supreme Court noted that its reference to alcohol prohibitions in Rosebud was "of secondary importance to our decision," and concluded that the enactment of such prohibitions, subsequent to the opening of the Indian lands, "as independent evidence of a congressional intention to diminish, * * * is suspect." Id. at 475 n. 18, citing Rosebud Sioux Tribe v. Kneip, supra at 623 n. 12 (Marshall, J., dissenting)("[I]n 1910 the definition of 'Indian country' was unsettled, and Congress may have feared that patented land within a reservation was nevertheless not Indian country under Bates v. Clark, 95 U.S. 204, 24 L.Ed. 471 (1877), because Indian title had been extinguished."). Here, we find that the language of the Act fails to demonstrate, by "clear" and "plain" language, an intent to diminish the Red Lake

---

[6]The Supreme Court has expressly refused to adopt a rule that, due to the apparent conflation of Indian ownership with reservation status, all transfers of land out of Indian ownership, at the turn of the Twentieth Century, should constitute a diminishment. See, Yankton Sioux Tribe v. Gaffey, supra at 1024, citing Solem v. Bartlett, supra at 468-69.

Reservation, by the right-of-way granted to the Railway, and that the liquor prohibition, standing on its own, also does not demonstrate any such intent.[7]

Turning to the two (2) other relevant considerations, in the context of the enactment of the Act of 1905, neither party has directed our attention to any relevant legislative history, which would shed further light upon the Act's purpose, and our review of the Congressional Record failed to disclose any material discussion as to that subject, beyond the statement of Representative Steenerson, that the bill was intended "to extend [the Railway's] right of way, so as to give to it further terminals," and to "enable [the Railway] to acquire some more land for further terminal facilities." 39 Cong. Rec. 1854 (1905). Further, neither party has proffered any information, as to how the Land has been subsequently treated for purposes of the Court's jurisdiction -- other than the Beltrami County property tax assessments, as to the Redby Garage --

_____

[7]We find further support for our conclusion in the current statutory language which, for purposes of the Major Crimes Act, includes rights-of-way in Indian Country, see, Title 18 U.S.C. §1151, but excludes rights-of-way, and fee-patented lands in non-Indian communities, from Indian Country, for purposes of alcohol prohibitions. See, Title 18 U.S.C. §1154(c). Although that distinction was not present in the Statute that was in effect at the time of the Act of 1905, see, 29 Stat. 506, it remains clear that the fact, that a parcel of land is not considered to be part of Indian Country for one (1) purpose, has little bearing on whether it is part of Indian Country for other purposes.

- 18 -

the significance of which is not apparent nor explained by the Defendant.  See,

Defense Exhibits 2-5.

Our independent research uncovered one (1) Federal criminal case, in which the locus of the alleged crime was the Redby Garage but, in that case, there was no issue raised as to whether the Garage was located in Indian Country.  See, United States v. Norquay, 905 F.2d 1157, 1159, and n. 3 (8th Cir. 1990).  More significantly, the Minnesota Supreme Court has previously reversed a conviction, and held that the State did not have jurisdiction to prosecute an offense that had taken place on "a platted part of the townsite [of Redby] [that was] privately owned," and that was "originally patented to the Minneapolis, Red Lake and Manitoba Railway under the Act of February 8, 1905, 33 Stat. 708, by which the railway company was given an area of not to exceed 320 acres adjacent to its northern teminus" -- the exact same area of land at issue in this Motion -- and rejected the State's argument that the tract of land had been severed from the Reservation by the Act of 1905.  See, State of Minnesota v. Lussier, 130 N.W.2d 484 (Minn. 1964), citing Seymour v. Super-intendent of Washington State Penitentiary, supra.  Of course, that State case, which interprets Federal law, is not binding upon this Court, but we find it notable that both the State

and Federal Courts have treated that area of Redby as being under Federal criminal jurisdiction.

As a consequence, we conclude that the language of the Act of 1905, together with the legislative history that we have reviewed, fails to evince any clear congressional intent to diminish the Red Lake Reservation, and the subsequent treatment of the relevant land demonstrates that both the Federal and State Courts have considered the area to be subject to Federal criminal jurisdiction. Accordingly, we conclude that the Act of 1905 did not diminish the Red Lake Reservation, and that, even if the area of land, upon which the alleged crimes are asserted, by the Defendant, to have occurred, they would, nonetheless, be subject to Federal jurisdiction, and therefore, we recommend that the Defendant's Motion to Dismiss the Indictment be denied.

NOW, THEREFORE, It is --

RECOMMENDED:

That the Defendant's Motion to Dismiss the Indictment [Docket No. 22], be denied.

Dated: August 5, 2010                    *s/Raymond L. Erickson*
                                         Raymond L. Erickson
                                         CHIEF U.S. MAGISTRATE JUDGE

## NOTICE

Pursuant to Rule 45(a), Federal Rules of Criminal Procedure, D. Minn. LR1.1(f), and D. Minn. LR72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and by serving upon all parties **by no later than August 19, 2010**, a writing which specifically identifies those portions of the Report to which objections are made and the bases of those objections. Failure to comply with this procedure shall operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.

If the consideration of the objections requires a review of a transcript of a Hearing, then the party making the objections shall timely order and file a complete transcript of that Hearing **by no later than August 19, 2010**, unless all interested

parties stipulate that the District Court is not required by Title 28 U.S.C. §636 to review the transcript in order to resolve all of the objections made.